IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| NIKE, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 9:06-CV-43 |
| v. | § | |
| | § | |
| ADIDAS AMERICA INC. D/B/A ADIDAS | § | JUDGE RON CLARK |
| INTERNATIONAL, ADIDAS SALOMON | § | |
| NORTH AMERICA, INC., and ADIDAS | § | |
| PROMOTION RETAIL OPERATIONS INC., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF UNITED STATES PATENT NO. 6,487,796 AND NO. 6,298,314

Plaintiff Nike, Inc. ("Nike") filed suit against Defendants adidas America Inc. d/b/a adidas International, adidas Salomon North America, Inc., and adidas Promotion Retail Operations Inc. (collectively "adidas") claiming infringement of United States Patent No. 6,487,796 ("the ` 796 patent") and United States Patent No. 6,298,314 ("the ` 314 patent").   The court conducted a *Markman* hearing to assist the court in interpreting the meaning of the claim terms in dispute. Having carefully considered the patent, the prosecution history, the parties' briefs, and the arguments of counsel, the court now makes the following findings and construes the disputed claim terms.[1]

## I. Claim Construction Standard of Review

Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384 (1996) ("*Markman II*").   "The duty of the trial judge is to determine the meaning of

---

[1]Some of these constructions are based, in part, upon agreements of the parties set out in the accompanying Order On Agreed Claim Terms or in arguments or representations made on the record at the hearing.

the claims at issue, and to instruct the jury accordingly." *Exxon Chem. Patents, Inc. v. Lubrizoil Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (citations omitted).

"'[T]he claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citation omitted). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips*, 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)).

The words of a claim are generally given their ordinary and customary meaning. *Phillips* 415 F.3d at 1312. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."[2] *Id.* at 1313. Analyzing "how a person of ordinary skill in the art understands a claim term" is the starting point of a proper claim construction. *Id.*

A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Where a claim term has a particular meaning in the field of art, the court must examine those sources available to the public to show

---

[2] Based on the ` 796 patent and the representations of the parties at the hearing, the court finds that in regard to the ` 796 patent such a person would have at least a bachelor's degree in either biomechanics/biomechanical engineering, product design or mechanical engineering and at least two years of practical experience in the field of design or development of footwear, or the equivalent thereof. Based on the ` 314 patent and the representations of the parties at the hearing, the court finds that in regard to the ` 314 patent such a person would have at least a bachelor's degree in electrical engineering, computer engineering, bioengineering or biomechanics, and 2-3 years of experience in circuit design or analysis with some experience in software application, or equivalent qualifications.

what a person skilled in the art would have understood disputed claim language to mean.  *Id.* at 1414. Those sources "include 'words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'"  *Id.*  (citation omitted).

"[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips*, 415 F.3d at 1314.  In these instances, a general purpose dictionary may be helpful.  *Id.*

However, the Court emphasized the importance of the specification.  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  A court is authorized to review extrinsic evidence, such as dictionaries, inventor testimony, and learned treaties.  *Phillips*, 415 F.3d at 1317.  But their use should be limited to edification purposes.  *Id.* at 1319.

The intrinsic evidence, that is, the patent specification, and, if in evidence, the prosecution history, may clarify whether the patentee clearly intended a meaning different from the ordinary meaning, or clearly disavowed the ordinary meaning in favor of some special meaning.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995).  Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated "clear intent" to deviate from the ordinary and accustomed meaning of a claim term by redefining the term in the patent specification.  *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

The "'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading

the entire patent." *Phillips*, 415 F.3d at 1321.  However, the  patentee may deviate from the plain

and ordinary meaning by characterizing the invention in the prosecution history using words or

expressions of manifest exclusion or restriction, representing a "clear disavowal" of claim scope.

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  It is clear that if the

patentee clearly intended to be its own lexicographer, the "inventor's lexicography governs."

*Phillips*, 415 F.3d at 1316.

## II. Claim Construction - The ' 796 patent

The ` 796 patent discloses an article of footwear having a sole comprised of one or more

support elements formed of a resilient, compressible material.  The sole is alleged to enhance the

stability of a wearer's foot, particularly during lateral motion.  The support elements are designed

to deflect forces generated by movements in a manner that produces a force directed to center the

wearer's foot above the sole.  The deflection of the force is described as being due to the design of

the support elements, which are described as  having a downward cant of the support elements'

upper surfaces and flexion indentations.

The first five disputed terms are contained in Claims 9 and 42.  Claim 9 with the disputed

terms in bold and agreed terms in italics, states:

> An article of footwear having an upper for receiving a foot of a wearer and a sole
> attached to said upper, said sole comprising:
>
> **a cavity** located within a heel portion of said footwear, said cavity extending from a *medial*
> side to a *lateral* side of said footwear to define an open area extending through said sole;
>
> a *plurality* of **discrete, vertically-projecting, columnar support elements** located within
> said  cavity and formed of a **resilient and compressible material**, said support elements
> extending between upper and lower portions of said cavity to provide support for the foot in
> said heel portion of said footwear, said support elements including at least one support
> element with an upper surface having a cant that defines a downward slope on said upper

4

surface, said downward slope being directed toward an interior portion of said sole.

Claim 42 with the disputed terms in bold and agreed terms in italics, states in relevant part:

> An article of footwear having an upper for receiving a foot of a wearer and a sole attached to said upper, said sole comprising:
>
> a **cavity** located within a heel portion of said footwear, said cavity extending from a *medial* side to a *lateral* side of said footwear to define an open area extending through said sole; and
>
> four **discrete, vertically-projecting, columnar support elements** located within said cavity and formed of a **resilient and compressible material**, said support elements extending between upper and lower portions of said cavity to provide support for the foot in said heel portion of said footwear, said support elements including . . . .

1.      **"Discrete."**  Used in Claims 9 and 42.

Nike  proposed "individually distinct."  Adidas suggests "each support element must be completely separate and distinct from other support elements."  Both parties include "distinct" in their definitions.  Since the parties have agreed that "plurality" means more than one, we know we are dealing with two or more different items.  Claims 9 and 42 describe  "said support elements extending between upper and lower portions of said cavity to provide support for the foot in said heel portion . . ."  This establishes that the support elements are all located together in the same cavity of the sole of the shoe.  Every embodiment described, including the preferred embodiment, and every diagram, has the support elements resting on, attached to, formed with, or embedded in the bottom of the cavity.

Adidas' proposal of "completely separate and distinct from other support elements" implies no contact between the elements, as if only one of the support elements can be in the shoe, with the others located perhaps in the pocket or hand of the wearer.  This goes too far, as adidas seems to

recognize by stressing in its brief that its definition would not exclude columns joined at the top and bottom. But that is not the import of adidas' proposal, as written.

A claim should be interpreted, if practicable, so as to give it effect rather than to have it fail. *Nazomi Communications Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005). An interpretation that strains to exclude all described embodiments, including the preferred embodiment is not likely to be correct. *See Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.,* 429 F.3d 1364, 1374 (Fed. Cir. 2005).

Adidas also seems concerned with the possibility that a columnar support may touch one of the walls or sides of the cavity. Nothing in the claim language or specification prevents that, and Figures 5, 8, and 12 seem to show such an embodiment. But the supports are still distinct and separated from each other.

The diagrams illustrate, and the specification describes, support elements that are distinct, and separated from each other, although they may be connected at the top and bottom. *See* ` 796 patent, Figs. 3, 4, 6, & 7; ` 796 patent, col. 6, ll. 54-55; `796 patent, col. 6, l. 66 - col. 7, l. 3. Construction of "discrete" as "individually distinct" and "separated" would be appropriate in the context of the rest of the claim language, be in line with the specification, and would comport with the common definition of the term. *See* THE MERRIAM-WEBSTER THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2002) ("discrete" means "consisting of distinct, unconnected, or unrelated parts."). Therefore, this term is construed as follows:

> **"Discrete"** support elements means: support elements that are "individually distinct, and which are separated from each other, though they may be connected at the top, the bottom, or both."

**2. "Vertically-projecting, columnar support elements**"   Used in Claims 9 and 42.

Nike argues that this phrase should be defined as: "support elements resembling a column and projecting in a vertical direction."  Adidas proposes: "a support element that is shaped like a column having an outer surface forming a continuous perimeter around its upright axis and a substantially circular cross section."  For purposes of analysis,  it is helpful to consider the components of this phrase separately, although they must be combined to determine the meaning of the claim.

**"Vertically Projecting"**

At the hearing, the parties agreed that "vertically projecting" meant to be oriented generally from the sole of the shoe toward the upper, as opposed to being oriented between the lateral and medial sides of the foot.  So we know that the support element must have a shape which is oriented (projects) from the sole toward the upper.  In other words, the element can not be of a completely irregular shape; it must have an axis which can be oriented.  This comports with the specification. *See* ` 796 patent, col. 3, ll.39-41 (columns are loaded substantially axially during foot strike); ` 796 patent, col. 7, ll. 36-37 (located on the central axis of the column).

**"Columnar Support Elements"**

Beginning, as always, with the claim language,  it is clear from the previous discussion that each of the support elements has an axis running from the sole toward the upper to provide support for the foot, which is in the upper.   But the claim does not state precisely what is meant by "columnar."   There is no indication in the patent that "columnar" is used in any special technical sense, and it is not specially defined in the patent.  The figures depict supports with a generally circular outside perimeter.  They may be tapered, or barrel shaped, and the circumference may be

7

grooved, or otherwise not be perfectly smooth.  The written specification describing the figures certainly does not contradict this impression.

Nike asserts that "columnar," as used in the claim could include virtually any shape or configuration, relying on the structure shown in Figures 20-22, described as an alternative embodiment with a "single columnar support element."[3]  *See* ` 796 patent, col. 10, ll. 63-65.  Nike also relies upon Figures 23-24, described as a second alternative embodiment with "a single columnar support element."  *See* ` 796 patent, col. 11, ll. 8-11.

However, during the prosecution of the patent, the examiner noted that these two embodiments were "patentably distinct species of the claimed invention" and required the applicant to elect a single disclosed species, pursuant to 35 U.S.C. § 121.  *See* Office Action 12/07/2001, p. 2, Ex. J to Nike's Opening Claim Construction Brief, [Doc. # 69, Attachment # 1, p. 43 of 54].  The applicant elected to pursue what was called the first species, or Group 1, shown in Figures 3-17, reserving the right to file divisional applications as to the other two groups or species.  *See* Response to Restriction Requirement, 1/2/2001, p. 1,  Ex. J to Nike's Opening Claim Construction Brief, [Doc. # 69, Attachment # 1, p. 46 of 54].

At the *Markman* hearing, the parties agreed that this meant that the claims of the ` 796 patent do not cover or read on the inventions shown in Figures 20-22, or Figures 23-24.  Additionally, Nike argues strenuously that the election to pursue only the first species supports a construction that each support is only on one side of the heel or the other.   This carries to extremes the concept of "having one's cake and eating it too."  How is one skilled in the art supposed to know that specification language, which the patentee has clearly agreed is not covered by the claim, should be used to define

---

[3]This may not be Nike's strongest argument since Figure 20 shows a circular structure.

the claim?  Such statements should not be relevant to the invention ultimately claimed in the ` 796

patent.  *See LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1378 (Fed. Cir.2006).

Any other rule would encourage patentees to describe every known and imaginable variation of

multiple inventions in the application, agree with the examiner that most of the description applies

to other inventions, and after the patent is issued assert that their claims cover the disavowed

structures or methods.

Nike also argues that the prosecution history supports its argument that "columnar" denotes

any  vague, undefined shape, so long as it is oriented to take up some of the space between the sole

and  the upper.  In discussing new claims 80 and 115, which became ` 796 patent Claims 9 and 42

respectively, the applicant stated to the Examiner: "In other embodiments, however, the support

elements have a rectangular shape.  Accordingly, the columnar support elements of the present

invention may have a variety of shapes that each have a discrete and vertically-projecting

configuration."  *See* Supplemental Information Disclosure Statement, 1/2/2001*,* p. 16 in Ex. J to

Nike's Opening Claim Construction Brief, [Doc.#69, Attachment # 2, p. 24 of 60].   The problem

with this statement is that it is not correct.  The patent does not depict or describe any "columnar"

support element, which is not shown or described as  cylindrical or having a circular cross-section.

Additionally, in the same Statement, the applicant distinguishes U.S. Patent No. 6,305,100

("Komarnycky") by stating: "In rejecting the original claims that [sic] Examiner analogized ridges

12 on outer sole 10 to the claimed support elements.  Unlike the recitations of independent claim 80

(Claim 9 in present patent), however, ridges 12 do not have the required columnar structure."  *See*

Supplemental Information Disclosure Statement, 1/2/2001*,* p. 19 in Ex. J to Nike's Opening Claim

Construction Brief, [Doc.#69, Attachment # 2, p. 27 of 60].  But the "ridges 12" in the Komarnycky

9

Patent's Figure 1 are vertically projecting, rectangular structures which slope toward the center.  *See* Appendix I to this Opinion (comparison of Figure 1 of the Komarnycky patent with Figure 7 of the `796 patent).  So the applicant has clearly stated that these rectangular shapes are not "columnar." Applicants cannot expand the scope of their claims, as described in the specification, by contradictory statements to the Examiner.  *See Honeywell Intern., Inc. v. ITT Industries, Inc.,* 452 F.3d 1312, 1318-1319 (Fed. Cir. 2006).

Contradicting Nike's assertion that "columnar" includes other shapes is a distinction made in the specification.  "In a preferred embodiment, the article of footwear contains *two forms of support elements, cylindrical columns and an aft support*."  `796 patent, col. 5, ll. 5-7 (emphasis added).  Recognizing the patentee's choice to distinguish between two forms of support, and to call only one of them "cylindrical columns," is not the same as importing limitations from the preferred embodiment.

In a more detailed description, the specification states: "Sole **106** is further comprised of support elements **108**, consisting of *columns* **108a -108d** and *aft support* **108e** . . . ."  `796 patent, col. 6, ll. 54-57 (emphasis added).  Examining the various figures, the "aft support" is the only one that does not have a cylindrical shape, and it is never described as "columnar."  *See* `796 patent, col. 8, ll. 57-60.

Nike also raises the issue of claim differentiation.  Dependent Claims 11 and 48 expressly limit independent Claims 9 and 42 respectively, by saying "said support elements have a cylindrical configuration."  Nike argues this implies that Claims 9 and 42 include other configurations.

"'[C]laim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim."  *Curtiss-Wright Flow Control Corp.*

*v. Velan, Inc.*, 438 F.3d 1374,1380 (Fed. Cir. 2006).   But it is only a presumption - a guide, not a

hard-and-fast rule.  *See Kraft Foods Inc. v. International Trading Co.*, 203 F.3d 1362, 1368 (Fed.

Cir. 2000).  The patentee in this case had unbridled discretion in his choice of words for Claims 9

and 42.  He chose to modify "support elements" with the word "columnar."  Nike can not be heard

to say this word has no meaning, and that the columnar support elements of Claims 9 and 42 have

no definable shape, simply because another claim uses an additional modifier with virtually the

same meaning.   Patent practitioners have "long recognized that "claims may be multiplied . . . to

define the metes and bounds of the invention in a variety of different ways.'" *Tandon Corp. v. U.S.*

*International Trade Commission*, 831 F.2d 1017,1023 (Fed. Cir. 1987) *citing Bourns, Inc. v. United*

*States*, 537 F.2d 486, 492 *aff'd. per curiam,* 199 USPQ 256 (Ct.Cl. 1976).[4]

   Nike adamantly insists that "columnar" has a plain and ordinary meaning, and that its

construction - "support elements resembling a column . . . " reflects that plain and ordinary meaning.

But Nike could not give any description of "columnar" or "column" that did not use these very

words. An orbicular definition is not helpful, and "vertically-projecting columnar" can not mean that

any blob of material in any shape will do.  "I know it when I see it" is  not what Congress intended

in enacting 35 U.S.C. §112 ¶ 2.

   Resort to "plain and ordinary meaning" and to dictionaries should not override analysis of

the intrinsic evidence.  The discussion at the hearing of the plain and ordinary meaning of "column"

―――――――――――――――

   [4]This advice is still being presented to practitioners.  *See* T. Lohse, "Effective Patent
Prosecution: Critical Choices, Drafting Techniques, and Strategies," pp. 2-80 (presented at 11th
Annual Advanced Patent Law Institute, University of Texas School of Law) (recommending the
filing of the broadest possible generic and subcombination claims" and also "claims of narrow
and intermediate scope" to increase "the probability of infringement that is literal . . ." and to
increase the chances of an application of the doctrine of infringement.)

and "columnar" reflects the dangers of a court attempting to arrive at a lay definition, without sufficient consideration of the intrinsic evidence.  In any case, dictionaries of ordinary usage  use terms such as "round shaft," "tube," and "cylinder" when defining columns, and their illustrations are of cylindrical structures such as Doric and Ionic columns, perhaps with tapers or fluting.  *See, e.g.,* Oxford English Dictionary online *available at* [http://dictionary.oed.com](http://dictionary.oed.com) (architectural definition of "column" is "a cylindrical or slightly tapering body of considerably greater length than diameter, erected vertically as a support for some part of a building."); The Merriam-Webster Third New International Dictionary, Unabridged (2002)("column" means "a pillar consisting of a shaft, a capital, and usually a base, the shaft being of a circular section except as it is fluted or channeled."); The Merriam-Webster's Collegiate Dictionary Tenth Edition (1993)("column" means "a supporting pillar, especially one consisting of a usually round shaft, a capital, and a base").[5]

At the hearing, the court questioned the parties closely about whether columnar implied that the vertical axis must be greater than the distance across the cross-section of the support axis.  In general usage, columns are frequently depicted and described as being long and narrow. Nike  points out that in all of the figures in the patent, the vertical axis of the "columnar" support elements is shorter than the distance across the cross-section.  These figures are not necessarily scale drawings. Figures generally may not be used to define precise dimensions, nor to contradict the written description in a claim or specification.  However, these figures give an indication of relative sizes. It would be unusual to define a claim so as to exclude the embodiments depicted in every figure in

----

[5]Nike's Opening Brief included this definition of "column" in Exhibit E.  *See* Doc. # 66, Attachment # 5, p. 13 of 31(citing The Merriam-Webster's Collegiate Dictionary Tenth Edition (1993)).

the patent, and the court will not do so in this case.

The applicant chose to withdraw from consideration the embodiment shown in Figures 23-24, and evidently never pursued a divisional application.  He also chose to limit Claims 9 and 42 by modifying "support elements" with the word "columnar."  He chose to include in the specification describing the columnar support structures, only examples and drawings of structures which have a generally circular cross-section, while support structures of other shapes are labeled as "aft support."  The applicant told the Examiner that the generally rectangular vertically projecting structures in Komarnycky are specifically not "columnar."  A vague contradictory statement in the same document is not grounds for ignoring or expanding the word "columnar." The presumption of claim differentiation is not strong enough to ignore, or ascribe an amorphous meaning to, the word.  Nike has strongly and unqualifiedly represented and argued that the court should adopt the "plain and ordinary" meaning of columnar.  The primary definitions and illustrations of column and columnar in dictionaries denote a cylindrical structure.  This comports with the court's analysis of the specification and file history, and gives no reason to adopt a different definition.  The court will define this term as follows:

> **"Vertically-projecting columnar support element"** means: "a generally cylindrically shaped supporting structure, which may be tapered at either or both ends,  and/or grooved or fluted, the non-circular axis of which is oriented generally from the sole to the upper and not between the medial and lateral sides of the foot."

**6. "Cavity."**  Used in Claims 9 and 42.

Nike argues that this term does not need any construction and that the word should be given its ordinary meaning.  Adidas states that the term "cavity" must be construed because the inventors

13

acted as lexicographers in defining "cavity."  Adidas proposes "a cavity is an open area extending through the sole that is defined as the space between a top heel portion and a bottom heel portion, both portions extending continuously from the medial to the lateral side."

The parties have agreed that the term "medial" means inside (of the foot) and the term "lateral" means outside (of the foot).   The parties also agreed at the hearing  that "cavity" means "void" or "open space."   The only dispute is whether the cavity must be bounded  at the top and bottom.

Adidas asserts that the patentee provided a special definition of cavity: "A cavity in sole **106** is defined by the space between heel plate **104** and base **110** that is not occupied by support elements **108**." ` 796 patent, col. 6, ll. 63-65.  But this is just a clever appropriation of the word "defined" to imply that the patentee was interpreting the meaning of the word "cavity," rather than delineating the boundaries of the cavity in a preferred embodiment.

Neither the claim nor the specification limit "cavity" to a void with a physical structure at the top and the bottom.  The parties agree that one side of the cavity is bounded by the bottom of the heel plate - the part on which the heel rests.  The rest of the claim language defines the other limits of the cavity - "said cavity extending from a medial side to a lateral side of said footwear to define an open area extending through said sole."  Nothing in the claim, the specification, or the prosecution history indicates that "cavity" has to be re-defined to explain this language or to further delineate the limits of the cavity.  The court will define this term as follows:

**"Cavity"** means: "an open space."

**7. "Resilient and compressible material."**   Used in Claim 9 and 42.

Nike proposes "material for the support element that can be reduced in height when a force is applied by the foot (compressible), but substantially returns to the original height when the force is removed (resilient)."  In their brief, Adidas proposes only a slight modification to the definition of "resilient" – "substantially returns to the original **shape** when the force is removed."[6]  As to the term "compressible," adidas suggests "materials that can be squeezed under the loads typically experienced in use of footwear to occupy substantially less volume to provide cushioning."

The parties admit, and the court agrees, that there is little difference between "returns to the original shape" and "returns to the original height."  Other language in the claim already indicates the support elements are "vertically-projecting" between the sole and upper.  The force of the foot is directed downward, toward the sole, so the other claim language already denotes the direction of the change during compression.  Accordingly, the court will use "substantially returns to the original shape."

Nike asserts that "compressible" means the material can be reduced in height.  Adidas argues that it must mean the material can be substantially reduced in volume.  The '796 patent incorporates U.S. Patent No. 5,343,639 ("Kilgore").  *See* ` 796 patent, col. 2, ll. 37-40.  The Kilgore patent

---

[6]Nike argues that adidas has waived the right to propose any construction for the term "resilient" because they failed to comply with P.R. 4-1 and P.R. 4-2.  These rules require each party to list the claim terms, phrases, or clauses which that party contends should be construed by the court and to exchange a preliminary proposed construction of each claim term, phrase, or clause identified with the opposing party.  *See* P.R. 4-1 and P.R. 4-2.  Adidas denies that it has not complied with the rules.  There is no evidence before the court to suggest that either party has not complied with the patent rules.  A defendant is not required to guess what claim terms may be in dispute, and may respond to a proposal from a plaintiff.  This does not mean that a defendant would have an absolute right to propose, after the deadline, terms not identified by the plaintiff.

15

discusses the use of compressible materials, such as foams, and compressible structures, such as a gas or fluid filled bladder.  *See* ` 639 patent, col. 4, ll. 53-68;  ` 639 patent, col. 11, ll. 45-57.  But "resilient and compressible" in Claims 9 and 42 of the ` 796 patent  modify "material."  There is no indication in either claim or in the specification that the term refers to a compressible structure, made up of material which itself would not be compressed by the force applied by a foot (such as a spring made of steel).  On the other hand, there is no indication that the volume of the material must be substantially decreased.

Adidas points to passages in the specification indicating a preference for foam type materials which are reduced in volume under compression.  But a preference for one material over another in a specification is not necessarily a limit to a claim.  When some materials are compressed by a force along one axis (in this case reduced along the vertical axis from the upper to the sole by pressure of the foot) they expand on other axes (for example in this case toward the medial and lateral sides of the shoe) without much reduction in total volume.   There is no indication in the patent or the file that compression, as used in this patent, refers only to total volume compression.  Therefore this term is defined as follows:

> **"Resilient and compressible material**" means "a material that will change shape as force is applied by a foot, and which will return to substantially the same shape when the force is removed."

**8. "Said heel plate."** Used in Claim 16.

Claim 16, with the disputed term in bold states:

The article of footwear of claim 9, wherein **said heel plate** underlies at least a portion of an arch of the foot and substantially all of the heel.

Adidas argues that the dependent Claim 16 is invalid in violation of 35 U.S.C. § 112, ¶ 4. This section requires a dependent claim to "specify a further limitation of the subject matter claim." Because Claim 9, the independent claim, does not recite "heel plate," adidas asserts that Claim 16, as written, does not further limit Claim 9 and, therefore, is invalid. *See Pfizer v. Ranbaxy Laboratories Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2005).

Nike argues that the use of "said" was an error that should be corrected in claim construction to mean "a."[7] Construing a term in accordance with the principles of claim construction is different from correcting terms because of a typographical or clerical error.  The court can correct such an error only if: (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification; and (2) the prosecution history does not suggest a different interpretation of the claims. *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

Nike asserts that the specification and claims make ample references to "heel plate" so a substitution of "a" for "said" is not subject to reasonable debate.  But the same argument could be made for substituting "claim 8" for "claim 9" in Claim 16, at Column 13, line 1.  Then Claim 16 would impose a further limitation on the heel plate described in Claim 8. *See Hoffer v. Microsoft*

---

[7]Nike argues that adidas did not propose a construction and so waived the right to object. Even if adidas waived the right to propose a construction of this term, it is not disputed that the invalidity contentions were timely filed, and so adidas would  not have waived their invalidity argument.

*Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005).  If changing "9"to "8"makes as much sense as replacing "said" with "a," then Nike's proposed correction is "subject to reasonable debate."  Claim 16 cannot be corrected in claim construction.

### III. Claim Terms - The ' 314 patent

The ' 314 patent relates to the monitoring of the orthopedic motion of a person by detecting when a person starts and stops moving.  The patent discloses various methods for monitoring the movement of a person by using a sensor to generate different signals in response to the person's movements.  Specifically, the subject invention teaches a method for monitoring a person's movement on foot by using a sensor to generate a signal which indicates whether the person is walking or running, and starting a timer in response to the identifying characteristic.  When a person ceases to walk or run, then in response to this identifying characteristic, another action is taken.

Nine of the thirteen disputed claim terms are either in Claim 13 or Claim 27.  Claim 13, with the disputed terms in bold and agreed terms in italics, states:

A method for monitoring movement of a person in locomotion on foot, comprising steps of:

(a) mounting a sensor on the person;

(b) using the sensor *to generate a signal in response to* **movement of the person**;

(c) after the person has begun walking or running, analyzing the signal to identify a *characteristic in the signal that indicates the person has initially ceased taking footsteps*; and

(d) determining **an elapsed time period** based on a time at which the characteristic appeared in the signal

18

Claim 27, with the disputed terms in bold and agreed terms in italics, states:

A method for monitoring movement of a person, comprising steps of:

(a) mounting a sensor on a foot of the person;

(b) using the sensor *to generate a signal in response to* **movement of the foot of the person**;

(c) after a foot of the person has been in motion, analyzing the signal to identify a *characteristic in the signal indicative of the foot initially ceasing to be in motion*; and

(d) measuring **an elapsed time period** based on a time at which the characteristic appeared in the signal.

**1. "Initially ceased taking footsteps."**  Used in Claims 13(c) and 18.

At the hearing, the parties agreed that "initially ceased taking footsteps" means "the first time a person stops stepping." This comports with the use of the term in the specification and with common everyday usage of the term.  Therefore the term is defined as follows:

**"Initially ceased taking footsteps"** means "the first time a person stops stepping."

**2. "Foot initially ceasing to be in motion."**  Used in Claims 27(c) and 31.

At the hearing, the parties agreed that "foot initially ceasing to be in motion" means "the first time a person's foot stops moving." This comports with the use of the term in the specification and with common everyday usage of the term.  Therefore the term is defined as follows:

**"Foot initially ceasing to be in motion"** means "the first time a person's foot stops moving."

**3. "Movement of the person."** Used in Claims 13(b), 18, 32(b), and 43.

Adidas proposed "any movement of the person."  Nike suggested  "movement of the person during an athletic endeavor."   Nike's proposal goes far beyond anything indicated in the claim, specification, or the patent history.  These claims all mention walking.  While walking can be "athletic" in nature, in common usage it can also just be  be "locomotion on foot" as stated in the claims.  In view of the language of the patent, labeling movement  from one place to another as "an athletic endeavor" is stretching the concept.  Nike stated that initially it had thought no construction of movement was needed, and that its proposal was simply a response to the suggestion of "any movement."

It is clear that the invention is not intended to pick up irrelevant small motions such as yawns or eye blinking.  As stated at the hearing, adidas wants the term defined as "any movement" so that accused devices can be distinguished because they only pick up movements with a certain minimum force or acceleration.  The claims themselves state they are each a method or system "for monitoring *movement* of a person in locomotion on foot." ` 314 patent, Claims 13, 18, 32, and 43 (emphasis added).  There is no indication in the patent, nor has adidas proposed, that "movement" in this first sentence of each of the claims at issue must be read as "a method (or system) so sensitive that it monitors every conceivable movement of a person in locomotion on foot."  So why should the same word, "movement," be so defined in a later sentence of each of these claims?

Each of these claims states that it is a method or system involving the analysis of a signal to determine if someone has stopped walking or running, and in some cases whether they have started walking or running.  It would not be proper for the court to adopt an overly expansive construction of "movement," which is not stated or implied by the claims themselves, nor suggested in the

20

specification or patent history.

Not every word in a patent is a technical term of art in need of construction.  There is no basis in the patent, the prosecution history, or in the extrinsic evidence to conclude that "movement" might be confusing to jurors, or that it is used in some technical sense recognized by those skilled in the art.  The parties' agreement to the meaning of "initially ceasing to be in motion" as discussed above, supports this analysis.

To simply  define "movement of the person" in terms such as "motion of the person" does not add much clarification.  One skilled in the art, and the average juror, would likely understand that these are synonyms, and apply their ordinary meaning.  Claim construction "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The court finds no reason to construe "movement of the person" in these claims.

**4. "Movement of the foot of the person."**  Used in Claims 27(b), 31, 44(b), and 55.

For the reasons discussed above, the court finds that this term has no special or technical sense from the point of view of one skilled in the art.   This analysis is supported by the parties' agreement to the meaning of "foot initially ceasing to be in motion."   The term  is non-technical language, used in its ordinary, everyday sense, and needs no further construction.

**5.** "Determining [determine] **an elapsed time period** based on a time at which the characteristic appeared in the signal."  Used in Claims 13(d), 18, and 31; and

"Measuring **an elapsed time period** based on a time at which the characteristic appeared in the signal."  Used in Claim 27(d).


Nike states that no construction of "an elapsed time period" is necessary, and that the term should be given its plain and ordinary meaning in each of these claims.  Adidas proposes "measuring the time period that begins when the person starts moving and ends when it is determined that the person has ceased moving."  There is no disagreement that some interval of time is being determined or measured.  The dispute is whether or not it must end when the characteristic of the signal appears.

The pertinent language  of Claims 13, 18, 27, and 31 is very similar so the court will refer specifically  to Claim 13.  That claim describes generation of a signal after a person has begun walking or running.  Paragraph (c) of Claim 13 describes "analyzing the signal to identify *a characteristic* in the signal that indicates the person has initially ceased taking footsteps."  ` 314 patent, col. 14, ll. 18-21 (emphasis added).   The disputed phrase is found in paragraph (d) of Claim 13, and, logically, "the characteristic" must refer back to "characteristic" in paragraph (c) of Claim 13.  "Characteristic" is not used elsewhere in the Claim.

Therefore, the phrase in dispute refers only to the characteristic  "that indicates the person has initially ceased taking footsteps," or, as it has been agreed, when the person has stopped stepping.  There is no reference to the time the person began stepping.  The elapsed time to be measured could be from the point at which the first step was taken.  But that is not required by the claim language.  It could be  from the time the person stopped.   Nothing in the claim language

would eliminate the second possibility, which might be found in a system which measured a set time after stopping and then started a pulse or blood pressure monitor to determine recovery.  (The time it takes the individual to return to the individual's resting pulse rate or blood pressure.)

      The specification describes both situations – measurement of time between the first and last steps, and the taking of some action at some time interval after the point at which the characteristic which shows the person first stops.  *See* ` 314 patent, col. 11, ll. 53-62.  ("a timer is stopped or another appropriate action is taken.").  Additionally, the specification states that two timers may be involved, which indicates that the "elapsed time period" measured from when the "characteristic" shows that steps have stopped may not be related to the time the steps started.  *See* ` 314 patent, col. 12, ll. 6-7 (timer stopped when the steps started).

      Adidas' strongest argument is based on statements made by the patentee to the Examiner.  An Office Action mailed September 15, 2000 rejected Claim 14 (present Claim 13) because it would have been obvious to one of ordinary skill to combine U.S. Patent No. 5,720,200 ("Anderson") and U.S. Patent No. 5,976,083 ("Richardson") to achieve the same result.  *See* Office Action, 9/15/2000, Ex. K to Nike's Opening Claim Construction Brief, [Doc. # 70, Attachment # 1, pp. 18-19 of 50].  The Response to the Office Action used the phrase "and to determine an elapsed time period between when the first and second characteristics appeared in the signal."  Response to the September 15, 2000 Office Action, 5/21/2001, p. 18 in Ex. K to Nike's Opening Claim Construction Brief, [Doc. # 70, Attachment # 1, p. 45 of 50].  But that does not accurately describe Claim 13, which does not mention a first characteristic.  The Response goes on to state:

> the proposed combination of Anderson and Richardson does not disclose
> or suggest at least one controller , or any other device, that determines
> an elapsed time period based upon an identified characteristic in a signal

that indicates that a person has initially ceased taking footsteps after
having been walking or running.

Response to the September 15, 2000 Office Action, 5/21/2001, p. 18 in Ex. K to Nike's
Opening Claim Construction Brief, [Doc. # 70, Attachment # 1, p. 45 of 50].

Taken together, these statements in successive paragraphs in the Response are not the most accurate
exposition of the claim language.  They are also not a clear limitation on, nor a disavowal of, an
embodiment of the language in Claim 13 (nor Claims 18, 27, and 31).

The claim language and the specification indicate that the "elapsed time period" may occur
before or after the "characteristic" appears.  The court will construe this claim term as follows:

Determining or measuring  **"an elapsed time period"**  based on a time at which the
characteristic appeared in the signal means:   "Using the point at which the
characteristic appears to determine or measure an interval of time."

## IV.  Conclusion

The jury shall be instructed in accordance with the court's interpretation of the disputed claim
terms in the ` 796 and ` 314 patents.

So **ORDERED** and **SIGNED** this **18** day of **December, 2006.**

_____
Ron Clark, United States District Judge

# APPENDIX I

## U.S. Patent No. 6,487,796 (AVAR)

In all of the figures which were not
disavowed (Figure 7 being an example),
supports **108a**, **b**, **c**, and **d** are described as
"columnar" or "columns." **108e**
is described as an "aft support."



FIG. 7

---

## U.S. PATENT No. 6,305,100 (KOMARNYCKY)

The applicant distinguished this patent (Komarnycky)
from the patent at issue (Avar) by stating that the
ridges (**12**) were not columnar.  *See* Doc. # 69, Attachment # 2, p. 27 of 60.

FIG. 1

